[No. 37616.    Department Two.    July 1, 1965.]

DONNA LEE NOLL, *Respondent,* v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, *Appellant.*\*

*Preston, Thorgrimson, Horowitz, Starin & Ellis,* and *Frank M. Preston,* for appellant.

*Helsell, Paul, Fetterman, Todd & Hokanson* and *Richard W. Bartke,* for respondent.

FINLEY, J.—The defendant-appellant insurance company appeals the determination of the jury in the trial court that Maurice A. Noll, Sr., died of accidental causes. Mr. Noll had two group life insurance policies in force at the time of of his death with a total face amount of insurance of $7,000. The defendant company has admitted liability for this amount, but, on the grounds that Mr. Noll's death was caused by suicide and not by accident, it has denied liability for an equal amount under the double indemnity clause for death by accidental causes. Mrs. Noll, the beneficiary under

*Reported in 403 P.2d 898.

the policies and the plaintiff-respondent, brought this action to secure payment under the double indemnity clause.

The defendant insurance company assigns error to the trial judge's failure to direct a verdict in its favor in denying its motion for a judgment notwithstanding the verdict and in denying the alternative motion for a new trial. The following factual summary is relied upon to support these assignments of error.

Mr. Noll had been under the care of a psychiatrist; he had bad health, had suffered a nervous breakdown, and had been committed to a mental hospital during the summer of 1960. Mr. Noll was found in the early morning hours of January 10, 1962, in his garage. The car engine was running, the garage door closed, and his body was lying at the rear of the car with his face within one to three feet from the exhaust pipe. A sheriff deputy testified that Mrs. Noll, in hysteria, kept repeating, "Why did he do it?" The deputy also testified that Mrs. Noll stated that Mr. Noll had repeatedly threatened to commit suicide.

These facts stated in the abstract give strong support for the appellant's position. However, our jurisprudence is based on the adversary system, and the outcome of this case in the trial court is a good example of the system in operation when the respondent's view of and emphasis upon the facts is considered.

Maurice Noll was a young man, 34 years of age. He was happily married and had three children. He was a member of the Lutheran Church and was very active in church activities. He worked on the construction of the church's Valley Camp near North Bend, and he was chairman of the grounds subcommittee and of the building subcommittee.

In 1948 and 1953, Mr. Noll suffered two industrial injuries, and he underwent a series of operations. He had been under the care of a psychiatrist for approximately a year and one-half prior to his death. However, his health had been improving, and, by the end of 1961, it was better than it had been for years.

During the winter and spring of 1961, Mr. Noll attended a business school, where he studied accounting. As a result

of this accounting training, Mr. Noll secured employment in the accounting department of a structural steel company in Seattle. He continued his accounting course in the evening division of the business school. At the school he formed a friendship with Mr. Shomler, another student. Their families also became very friendly.

In the late summer of 1961, Mr. Noll decided to buy a home for his family. After considerable shopping, he and his wife purchased a house and moved into the new home on Saturday, December 30, 1961. Mr. Noll was elated about the ownership of a home, and he had various plans concerning the improvements he would gradually make.

During the day preceding the fatal event, Mr. Noll behaved in a normal way. He left home in the morning, and sometime during the day he saw his psychiatrist. In the afternoon, he called his friend, Mr. Shomler, and arranged to meet him at a restaurant close to the business school. They met at approximately 5:30. Mr. Noll behaved in a normal way. He told the friend about the house, the moving, and the work involved. He enthusiastically explained his plans for improvements on the house, and he told Mr. Shomler that he would invite him and his wife to visit the house as soon as the unpacking was finished. The two men parted about 6:40, after having arranged to meet the following evening at the same time.

Mr. Noll returned home at about 7 o'clock. The family had a late dinner. After the meal, Mrs. Noll did the dishes while Mr. Noll talked and played with the children. After the children went to bed, Mr. Noll and his wife sat in front of the fireplace making plans for the house. They retired about 9 o'clock.

The night of January 9 to January 10 was cold. The record shows that the downtown Seattle low temperature for the night was 37 degrees. The Noll home was in the north end of the city, which frequently experiences lower temperatures than the downtown area. During the night, Mr. Noll got out of bed and went into the bathroom. Upon returning to the bedroom he remarked to his wife that he was con-

cerned about the car because it had no anti-freeze and was parked outside the garage. The garage had been filled with boxes and furniture during the moving, and the car had not been put into the garage during the week. However, by the day of the fatal event involved herein, the garage had been partially cleared.

Toward the early morning, Mrs. Noll awoke with a start and smelled something strange. She promptly went into the living room looking for her husband, and heard a noise coming from the garage. She found the car engine running, and turned it off. Then she saw her husband lying behind the car on the floor, with the garage door ajar, but nearly closed. Mrs. Noll later discovered a fresh pot of coffee in the kitchen and that lunches for the following day had been started. Mr. Noll had a habit of getting up early and making the lunches for his children and himself. Mrs. Noll also later noticed that the car license tabs which she had left on a table had been affixed to the car license plates. No suicide note of any kind was found.

The respondent argues that the jury could have accepted several theories supporting the conclusion that Mr. Noll's death was accidental. First of all, the jury could have concluded that Mr. Noll moved the car into the garage because he was afraid that the water cooling system would freeze during the cold night and the car motor would be wrecked; furthermore, that he left the car engine running in the garage to heat up the water in the cooling system as a further precaution against freezing. While the engine was running, he then affixed the license tabs. His slacks, which had come from the cleaners just the day before, had stains on the knees, indicating that he had knelt on the floor while he attached the tabs.

Expert testimony at the trial provided background information on the dangerous nature of carbon monoxide, a colorless and odorless gas. Among other things, the affinity of hemoglobin in the red blood cells for carbon monoxide is approximately 200 to 300 times that of its affinity for

oxygen; and thus, even small amounts of carbon monoxide in the atmosphere are dangerous. The exhaust fumes of an average car contain approximately 5 per cent carbon monoxide. It can be noted that Mr. Noll had an old car, and its carbon monoxide production might well have been substantially higher than the average. The expert testified that a few deep breaths of an atmosphere containing 5 per cent carbon monoxide can render a person unconscious. Further, any exertion in an atmosphere containing carbon monoxide will accelerate unconsciousness and death.

Thus, respondent hypothesizes that when Mr. Noll was attaching the license tabs his face was very close to the exhaust pipe of the car, and that the jury could have believed that he took a couple of breaths in that position and then passed out.

Respondent's second theory as to what occurred is based on the fact that the door to the garage was defective. The prior owner of the house, a longshoreman weighing 200 pounds, testified that the door would jump off its tracks and fall suddenly. The jury could have believed that Mr. Noll left the car running because he was not sure whether the boxes in the garage left enough room for the door to close behind the car. Then, when he tried to close the door, the door came off its tracks and fell down, knocking Mr. Noll to the ground behind the car. As he lay on the floor for a few seconds, his face close to the exhaust pipe, he was overcome by the fatal gas.

█ The pertinent rule of law requires that the plaintiff's testimony be taken as true and accorded the most favorable inferences. Having this in mind, we are convinced that the evidence was sufficient to take the case to the jury and to support the jury's verdict for the plaintiff. Thus, the defendant's motions for a directed verdict and for judgment notwithstanding the verdict were properly denied by the trial judge.

█ The trial judge also denied the defendant's motion for a new trial. In this connection the trial judge stated:

Defendant's alternative motion for a new trial is hereby denied, the Court lacking power to grant the same, not-

withstanding the fact that the Court expressly holds that by the jury verdict substantial justice has not been done, and that said verdict is against the overwhelming weight of the evidence.

The defendant-appellant relies heavily on this statement in urging that the trial court erred in denying the motion for a new trial. However, we think that the trial judge was correct in denying a new trial. The trial courts do not lack *power* to grant a motion for a new trial in appropriate cases, but this is simply not one of the appropriate cases. It is obvious that the trial judge's very general statements that "substantial justice has not been done, and that the said verdict is against the overwhelming weight of the evidence" would in no event satisfy the requirement that:

In all cases wherein the trial court grants a motion for a new trial, it shall, in the order granting the motion, give definite reasons of law and facts for so doing. Rule 59.04W, RCW vol. 0.

We have extensively reviewed the above rule and its application in *Knecht v. Marzano*, 65 Wn.2d 290, 396 P.2d 782 (1964), and under these circumstances have concluded that further elaboration is unnecessary in the instant case. Suffice it to say that the trial judge has failed to give any reasons that would support granting a new trial. It seems he merely disagreed with the jury determination. This, of course, leads to affirmance of the judgment, and it is so ordered.

ROSELLINI, C. J., DONWORTH and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur.